O

JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| AMUSEMENT ART, LLC, | ) | Case No.  2-14-cv-08290-DDP-JPR |
| | ) | |
| Plaintiff, | ) | **ORDER RE MOTIONS FOR** |
| | ) | **SUMMARY JUDGMENT** |
| v. | ) | |
| | ) | [Dkts. 95, 97, 103, 137, 138] |
| LIFE IS BEAUTIFUL, LLC; | ) | |
| DOWNTOWN LAS VEGAS | ) | |
| MANAGEMENT LLC; AND DOES 1-10, | ) | |
| INCLUSUIVE, | ) | |
| | ) | |
| Defendants. | ) | |

Presently before the court are (1) Defendant Downtown Las Vegas Management's ("DLVM") Motion for Summary Judgment; (2) Defendant Life is Beautiful, LLC's ("LIB") Motion for Summary Judgment; (3) Defendants' Motion for Summary Judgment as to Counterclaims for Cancellation of Plaintiffs' Trademark Registrations; (4) Defendants' Motion for Partial Summary Judgment as to Plaintiffs' Claims for Monetary Damages; and (5) Defendants' Motion to Exclude Expert Testimony of Jonny Joseph. (Dkts. 95, 97, 103, 137, 138.) After reviewing the parties' submissions and hearing oral argument, the court adopts the following Order.

**I. BACKGROUND**

Defendant LIB hosts the Life is Beautiful festival in Las Vegas, Nevada. LIB's founder, Rehan Choudhry, first began working on the idea for the festival in 2012. (Boyd Decl., Ex. 1 (Rehan Choudhry Dep.) at 152:25-155:5.) Choudhry claims that the project was inspired by his sister's battle with depression and his desire for her to see that "Life is Beautiful." (*Id.* at 154:18-155:5.) In developing the festival's style, Choudhry collected digital images from Google searches related to his concept. (*Id.* at 25:17-26:5.) Included in these images was artwork created by Thierry Guetta, also known as Mr. Brainwash, which included the phrase "LIFE IS BEAUTIFUL." (*Id.* 22:9-16.) The images Choudhry collected eventually formed the basis of a pitch document he presented to investors when promoting his festival. (*Id.* at 29:14-23.)

In the fall of 2012, Choudhry hired a graphic designer to develop the festival's logo. (*Id.* at 71:8-18.) The designer produced an image of a heart made of splattered paint. (*Id.*) According to the designer, the image was meant to evoke the concept that life is beautiful but also messy and to allude to Choudhry's own heart attack at the age of 23. In November 2012, Choudhry publicly announced the project, and the first festival was held in the fall of 2013. (*Id.* at 20:14-20, 76:21-24.) The festival, which has been held annually since 2013, features music, food and alcohol tastings, public speakers, and art exhibitions and installations.

Plaintiff Amusement Art is a company owned by artist Thierry Guetta and his wife Debora Guetta. Amusement Art's sole business is to hold and license intellectual property produced by Thierry Guetta. (Boyd Decl., Ex. 3 (Mikael Cohen Dep.) at 27:14-18; 29:21-30:8.) In 2008, Guetta held his first solo art exhibition, entitled "Life is Beautiful." (Boyd Decl., Ex. 10 (Debora Guetta Dep.) at 153:11-20.) In some of his artwork, Guetta incorporates positive phrases such as "Love is the Answer," "Follow Your Dreams," and "Life is Beautiful." (Boyd Decl., Ex. 11 (Thierry Guetta Dep.) at 35:1-36:5.) Between 2008

and 2012, Guetta held approximately six additional exhibitions using the "Life is Beautiful" name. (*See* Boudreaux Decl., Ex. 15 (Guetta Dep.) at 51:21-25, 52:23-25.)[1]

In mid-2013, a common acquaintance introduced LIB to Guetta's business associates and encouraged the two parties to consider possible collaboration. (Boyd Decl., Ex. 50.) Over the next few months, LIB met with Guetta's representatives on several occasions to discuss Guetta's possible involvement in the festival. (Boyd Decl., Exs. 51-54.) In mid-2014, Guetta met in person with LIB for the first time. (Boyd Decl., Ex. 55.) According to LIB, the meeting did not go well. (*See* Boyd Decl., Ex. 55 (reporting that Guetta felt "disrespect[ed]" at the meeting).) Nonetheless, the parties met several more times to discuss possible business ventures. (Boyd Decl., Exs. 56, 57.) At some point, conversations turned from collaboration to a discussion of Guetta's intellectual property and the possibility of entering into a licensing arrangement. (*See* Boudreaux Decl., Ex. 41.) However, the parties were unable to reach an agreement and Amusement Art filed suit asserting claims for: (1) trademark infringement under the Lanham Act; (2) unfair competition, false designation, passing off, and false advertising under the Lanham Act; (3) copyright infringement; (4) unfair competition in violation of Bus. & Prof. Code § 17200; (5) common law trademark infringement and unfair competition; and (6) declaratory relief. (*See generally* FAC.)

At issue in this suit are Guetta's asserted rights to "splashed paint heart designs" and the phrase "Life is Beautiful." Guetta registered a copyright for the former in 2009 and now asserts that Defendants have violated his copyright and trademark rights in painted heart designs. (*See* FAC ¶ 20-22.) Between 2011 and 2012, Plaintiffs also filed eight "intent to use" trademark applications with the Patent and Trademark Office (PTO)

---

[1] Defendants contend that the shows in question had other titles such as "Untitled," "Under Construction," "Icons," and "Art Show 2011," and that the only indication that "Life is Beautiful" was part of the show title were promotional postcards, which had the phrase "Life is Beautiful" printed in small type, upside down on the corner of the postcard. (*See* Guetta Dep. at 49:13-55:13; Boyd Decl., Exs. 12, 30, 31, 32.) Guetta has submitted, however, some contemporaneous media accounts that use the name "Life is Beautiful" in association with the shows. (*See* Boudreaux Decl., Ex. 48.)

for the phrase "Life is Beautiful." (Boyd Decl., Exs. 13, 15, 17, 19, 21, 23, 25 and 26.) The applications covered goods and services in the international classifications for paints (Class 2), electronics and accessories (Class 9), jewelry (Class 14), paper goods and printed matter (Class 16), rubber goods (Class 17), leather goods (Class 18), housewares and glassware (Class 21), and textiles (Class 24). (*Id.*) After filing the applications, executives employed by Plaintiffs filed Statements of Use, under penalty of perjury, asserting that AA had actually used the phrase "Life is Beautiful" as a trademark to sell approximately 257 categories of goods within the application classes. (Boyd Decl., Exs. 14, 16, 18, 20, 22, 24, 27 and 28.) Along with its statements of use, Plaintiffs also submitted pictures of various goods with "Life is Beautiful" sales tags attached to them. In September of 2014, one month before filing this suit, Plaintiffs also filed a trademark registration application for the phrase "Life is Beautiful" in the classification for festival and community events. (Boyd Decl., Ex. 60.)

After this suit commenced, Defendants determined that a number of the statements of use submitted by Plaintiffs were false and that Plaintiffs did not actually sell many of the goods on which it obtained trademark registrations. (Boyd Decl., Ex. 5 (Patrick Guetta Dep.) at 114:14-118:14, 153:1-154:20; Boyd Decl., Ex. 10 (Debora Guetta Dep.) at 75:21-77:10, 77:17-80:15.) Defendants notified Plaintiffs that they intended to seek cancellation of the trademarks on the basis of fraud on the trademark office. (Boyd Decl., Ex. 39.) Plaintiffs then voluntarily surrendered eight of the trademark registrations but retained the 2014 registration in connection with festivals and art events. (Boyd Decl., Ex. 33.)

Defendants now move for summary judgment on all of Plaintiffs' claim and Defendants' counterclaims for cancellation. Defendants also move for partial summary judgment on the issue of monetary damages and to exclude Plaintiffs' expert Jonny Joseph.

///

///

**II. LEGAL STANDARD**

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). All reasonable inferences from the evidence must be drawn in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 242 (1986). If the moving party does not bear the burden of proof at trial, it is entitled to summary judgment if it can demonstrate that "there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 323.

Once the moving party meets its burden, the burden shifts to the nonmoving party opposing the motion, who must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. Summary judgment is warranted if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. There is no genuine issue of fact "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

It is not the court's task "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan,* 91 F.3d 1275, 1278 (9th Cir. 1996). Counsel has an obligation to lay out their support clearly.  *Carmen v. San Francisco Sch. Dist.,* 237 F.3d 1026, 1031 (9th Cir. 2001). The court "need not examine the entire file for evidence establishing a genuine

1   issue of fact, where the evidence is not set forth in the opposition papers with adequate

2   references so that it could conveniently be found." *Id*.

3   **III. DISCUSSION**

4       **A. Unclean Hands Defense to Trademark Infringement Claims**

5         As a threshold matter, Defendants contend that all of Plaintiffs claims arising out

6   of the alleged infringement of the "Life is Beautiful" mark are barred by the doctrine of

7   unclean hands. [2] "Unclean hands is a defense to a Lanham Act infringement suit."

8   *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 847 (9th Cir. 1987). The Ninth

9   Circuit has explained that the doctrine of unclean hands "bars relief to a plaintiff who has

10  violated conscience, good faith or other equitable principles in his prior conduct, as well

11  as to a plaintiff who has dirtied his hands in acquiring the right presently asserted."

12  *Dollar Sys., Inc. v. Avcar Leasing Sys., Inc.*, 890 F.2d 165, 173 (9th Cir. 1989) (citing *Pond v.*

13  *Insurance Co. of North America*, 198 Cal. Rptr. 517, 522 (Ct. App. 1984). To prevail on an

14  unclean hands defense, a defendant must demonstrate by clear and convincing evidence

15  "[1] that the plaintiff's conduct is inequitable and [2] that the conduct relates to the

16  subject matter of [Plaintiff's] claims." *Fuddruckers*, 826 F.2d at 847; *see also Japan Telecom,*

17  *Inc. v. Japan Telecom Am. Inc.*, 287 F.3d 866, 870 (9th Cir. 2002).

18        1.   Inequitable Conduct

19        Defendants contend that Plaintiffs engaged in inequitable conduct by fraudulently

20  registering eight trademarks for the phrase "Life is Beautiful." Specifically, Defendants

21  note that Plaintiffs secured these registrations by making statements to the PTO, under

22  penalty of perjury, that Plaintiffs had used the phrase as a source identifier for nearly 250

23  categories of good and services despite the fact that they never actually sold any such

24

25

26  [2] In their Opposition, Plaintiffs argue that the unclean hands defense is unavailable
    because Defendants failed to plead sufficient facts to give Plaintiffs fair notice of the
    defense. (Pls.' Opp'n LIB Mot. Summ. J. 8-9.) However, Defendants expressly pled the

27  defense in their answer (Dkt. 49 at ¶ 97) and Plaintiffs never moved to strike this answer.
    Moreover, the Answer contains nearly ninety paragraphs detailing Defendants' account

28  of the asserted fraudulent registration of the "Life is Beautiful" marks. (*See* Dkt. 49 ¶¶
    112-204.)

1   items. (Def. LIB's Mot. Summ. J. 10.) Plaintiffs do not deny that their registration

2   applications contained false statements but contend there is no evidence that the

3   statements were made knowingly or with intent to defraud the PTO. (Pls.' Opp'n Defs.'

4   Mot. Summ. J. for Cancellation Counterclaim 6-7.) Plaintiffs also contend that their

5   actions did not rise to the level of "egregious misconduct," which some courts have

6   required before invoking the doctrine of unclean hands. *See Citizens Financial Group, Inc.*

7   *v. Citizens Nat. Bank of Evans City*, 383 F.3d 110, 129 (3d Cir. 2004).

8       It is well-established that fraud on the PTO in acquiring a patent can give rise to

9   an unclean hands defense. *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S.

10  806, 814 (1945). As the Supreme Court has explained:

11      [t]he possession and assertion of patent rights are issues of great moment to
        the public. A patent by its very nature is affected with a public interest . . . .

12      The far-reaching social and economic consequences of a patent, therefore,
        give the public a paramount interest in seeing that patent monopolies
        spring from backgrounds free from fraud or other inequitable conduct and

13      that such monopolies are kept within their legitimate scope.

14  Id. at 815–16 (citations omitted). Lower courts have found that a similar logic bars

15  recovery in the trademark context as well. *See, e.g., Elec. Info. Publications, Inc. v. C-M*

16  *Periodicals, Inc.*, No. 68 C 136, 1969 WL 9623, at *11 (N.D. Ill. Nov. 12, 1969) ("Plaintiff

17  shall be denied all relief because of its unclean hands due to its procurement and

18  maintenance of the three registrations by false or fraudulent representations and the

19  cancellation of two of the registrations does not purge the wrong."); *see also* J. Thomas

20  McCarthy, 6 *McCarthy on Trademarks and Unfair Competition* § 31:56 (4th ed. 2016) ("If

21  plaintiff is suing for infringement of a registered trademark, his fraud in the procurement

22  of the registration may constitute unclean hands.").

23      The operative question before the court is whether Plaintiffs' false statements to

24  the PTO rise to the level of fraud. Typically, courts are faced with claims of fraud on the

25  PTO in the context of cancellation actions.[3] The elements of a trademark cancellation on

26

27  _____

28  [3] As noted above, Defendants have also moved for summary judgment on their
    counterclaim for cancellation of Plaintiffs' Life is Beautiful trademarks on the basis of
    alleged fraud in registration. The court analyzes whether Plaintiffs obtained the

the basis of fraud are: "(1) a false representation regarding a material fact; (2) the registrant's knowledge or belief that the representation is false; (3) the registrant's intent to induce reliance upon the misrepresentation; (4) actual, reasonable reliance on the misrepresentation; and (5) damages proximately caused by that reliance." *Hokto Kinoko Co. v. Concord Farms, Inc.*, 738 F.3d 1085, 1097 (9th Cir. 2013). The parties do not dispute that the statements of use submitted by Plaintiffs were material false statements nor do they question whether the PTO reasonably relied on those misrepresentations.

As to the knowledge and intent elements, the court concludes that no rational jury could credit Plaintiffs' claim that the false statements were innocent mistakes in light of the extent of the deception. Plaintiffs filed eight separate trademark registrations representing that they used the "Life is Beautiful" phrase to sell hundreds of categories of goods. No record evidence suggests that Plaintiffs mistakenly believed they actually sold the majority of the claimed goods. Instead, Plaintiffs explain their actions by noting that the executives who filed the applications were not native English speakers and that they filed the applications without the assistance of an attorney. (Boudreaux Decl., Ex. XX.) This explanation is implausible given that Plaintiffs have lived in the United States and spoken English for over 30 years and have also affirmed that they have filed trademark applications across the world, (*See* Decl. of Debora Guetta ¶¶ 2-4; Decl. Patrick Guetta ¶¶ 2, 7.) Most troubling, however, is the fact that Plaintiffs provide no explanation for the several deceptive photographs submitted along with the registration applications. In addition to filing statements of use, Plaintiffs staged photographs of various goods with "Life is Beautiful" tags, which they later admitted they never actually sold. (*See* Boyd Decl., Ex. 16; Patrick Guetta Dep. at 109:17-110:16, 114:14-118:13.) Taken together, this evidence supports the conclusion that Plaintiffs knowingly made misrepresentations to the PTO in order to fraudulently obtain trademark registrations.

---

registrations at issue by fraud here but will address the remainder of the cancellation motion below. *See, infra*, Part III.B.

Turning to the issue of damages, the court concludes that no reasonable jury could find that reliance on Plaintiffs' false representations did not cause damage. By falsely securing the registration of marks that they never used and then later suing LIB on the basis of those marks, there is no question that Plaintiffs have harmed LIB. But the more pervasive harm in this case is the cost imposed on a public that relies on the integrity of the patent system. As the Supreme Court explained in *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*:

> The Lanham Act provides national protection of trademarks in order to secure to the owner of the mark the goodwill of his business and to protect the ability of consumers to distinguish among competing producers. National protection of trademarks is desirable, Congress concluded, because trademarks foster competition and the maintenance of quality by securing to the producer the benefits of good reputation.

469 U.S. 189, 198 (1985). Instead of furthering the Lanham Act's goal of fostering competition in the marketplace, Plaintiffs attempted to secure a monopoly over most plausible uses of the phrase "Life is Beautiful" without actually investing any resources into developing the goodwill of their brand. Plaintiffs falsely claimed ownership over the mark in eight classes of goods covering nearly 250 specific items. In doing so, Plaintiffs may have chilled potential competitors from entering the marketplace and developing their own brand identifications across an array of goods. To put into perspective the extent of the fraud, Plaintiffs registered the mark in nearly one-fifth of all possible classifications, asserting use in goods as varied as food coloring, watch boxes, beach umbrellas, cleaning sponges, talking children's books, and crime scene tape. (Answer ¶¶ 115, 118, 122, 126, 133, 141.) In fact, after eliminating trademark classifications that would plainly be inapplicable to the phrase at issue or Plaintiffs' business, the court could identify only four or five additional classifications in which Plaintiffs could have even conceivably registered this mark. While it is difficult to measure after the fact the precise magnitude of the harm of Plaintiffs' actions, the court concludes that there is no triable issue whether Plaintiffs' acted inequitably.

///

///

2.   Related to Subject Matter of Claims

The second element of an unclean hands defense requires Defendant to show that the inequitable conduct "relates to the subject matter of [Plaintiff's] claims." *Fuddruckers*, 826 F.2d at 847. Plaintiffs interpret this requirement to mean that the unclean hands doctrine only "'bars relief in Lanham Act cases when the plaintiff has engaged in precisely the same type of conduct about which it complains.'" (Pls.' Opp'n LIB's Mot. Summ. J. 12 (quoting *TrafficSchool.com, Inc. v. Edriver, Inc.*, 633 F.Supp.2d 1063, 1084 (C.D. Cal. 2008)).) According to Plaintiffs, this condition is not satisfied because the misconduct alleged against them is insufficiently similar to the misconduct they are alleging against Defendants. Specifically, Defendants complain that Plaintiffs committed fraud on the PTO while Plaintiffs contend that Defendants are engaged in trademark infringement. This argument is unconvincing for several reasons. First, Plaintiffs mischaracterize the conclusion in *TrafficSchool.com*, where the district court actually held that the relevant inquiry is whether "some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation" and went on to explain that this requirement was met "[m]ost commonly . . . when the plaintiff has engaged in precisely the same type of conduct . . . ." 633 F. Supp. 2d at 1084, *aff'd in part, rev'd in part on other grounds*, 653 F.3d 820 (9th Cir. 2011). Second, as noted above, several courts have held that fraud on PTO is precisely the sort of mischief that can give rise to an unclean hands bar to future trademark infringement actions. In none of those cases did the court require both parties to make competing allegations of fraud on the PTO. *See, e.g.*, *Precision Instrument*, 324 U.S. at 814; *Elec. Info. Publications*, 1969 WL 9623, at *11.

Contrary to Plaintiffs' contention, courts have actually held that "precise similarity is not required" to raise an unclean hands defense. *Pom Wonderful LLC v. Welch Foods, Inc.*, 737 F. Supp. 2d 1105, 1110 (C.D. Cal. 2010). Instead, "the bad faith must be 'relative to the matter in which [the plaintiff] seeks relief.'" *Id.* (quoting *Precision Instrument*, 324 U.S. at 814). Accordingly, "the relevant inquiry is 'not [whether] the plaintiff's hands are

dirty, but [whether] he dirtied them in acquiring the right he now asserts, or [whether] the manner of dirtying renders inequitable the assertion of such rights against the defendants.'" *Welch*, 737 F.Supp.2d at 1110 (quoting *Ellenburg v. Brockway, Inc.*, 763 F.2d 1091, 1097 (9th Cir.1985)) (alterations in original). Here, at least eight of the registrations involved marks where Plaintiffs dirtied their hands in acquiring the rights now asserted against Plaintiffs. Accordingly, the court concludes that these are directly related to the subject matter of the pending claims. The closer question is on the ninth trademark, which involves the registration of the phrase "Life is Beautiful" in connection with exhibitions and festivals, which Plaintiffs filed shortly before filing suit. While that mark is subject to cancellation proceedings before the PTO because of the false statements made in connection with the related marks, Plaintiffs have not yet surrendered the mark, and there is evidence to suggest that the mark is actually used with at least some of the claimed categories of goods.[4] Nonetheless, the court concludes that the fraud should bar all of Plaintiffs' trademark infringement claims. As explained above, Plaintiffs fraudulently filed for a number of trademarks on the phrase "Life is Beautiful" in 2011 and 2012, potentially deterring any competitors from entering the market and producing goods in any of hundreds of claimed categories. After filing for these registrations, Plaintiffs became aware that Defendants were using the phrase in connection with a category of goods that Plaintiffs had yet to claim in one of their eight trademark applications. Plaintiffs then filed another application and brought suit. The fact that this final registration has not yet been surrendered does not alter the court's conclusion that is a case "where some unconscionable act of one coming for relief has immediate and

---

[4] In full, the trademark application claims that the mark is used in commerce for:
Arranging, organizing, conducting, and hosting social entertainment events; Art exhibition services; Art exhibitions; Audio production services, namely, creating and producing ambient soundscapes, and sound stories for museums, galleries, attractions, podcasts, broadcasts, websites and games; Audio recording and production; Augmented reality video production; Book publishing; Organizing community festivals featuring primarily Art exhibitions and also providing film, fashion shows and exhibitions.
(FAC ¶ 17.)

11

necessary relation to the equity that he seeks in respect of the matter in litigation." *U–Haul Int'l, Inc. v. Jartran, Inc.*, 522 F.Supp. 1238, 1254 (D.Ariz.1981), *aff'd*, 681 F.2d 1159 (9th Cir. 1982).

### 3. Balance of Equities

Even though Plaintiffs have engaged in inequitable conducted related to the subject matter of the claims, the unclean hands defense does not always "permit a defendant wrongdoer to retain the profits of his wrongdoing merely because the plaintiff himself is possibly guilty of transgressing the law." *Johnson v. Yellow Cab Transit Co.*, 321 U.S. 383, 387 (1944). "Rather, determining whether the doctrine of unclean hands precludes relief requires balancing the alleged wrongdoing of the plaintiff against that of the defendant, and 'weigh[ing] the substance of the right asserted by [the] plaintiff against the transgression which, it is contended, serves to foreclose that right.'" *Northbay Wellness Grp., Inc. v. Beyries*, 789 F.3d 956, 960 (9th Cir. 2015) (quoting *Republic Molding Corp. v. B.W. Photo Utils.*, 319 F.2d 347, 350 (9th Cir. 1963)).

In the present case, the balance of equities weighs in favor of permitting Defendants to assert the defense. Plaintiffs have not only engaged in fraudulent acts in attempting to register the "Life is Beautiful" trademark, they have also attempted to profit off that fraud both by deterring competitors and by subjecting Life is Beautiful to the present litigation. Moreover, in acquiring these fraudulent registrations, Plaintiffs have undermined the sanctity of a trademark registration system that relies on parties truthfully representing which marks are bona fide source identifiers and which are not. These wrongdoings are not offset by Plaintiffs' weak claim for trademark infringement. Because the court concludes that unclean hands bars Plaintiffs' trademark infringement claim as to the "Life is Beautiful" mark, the court need not resolve the merits of the underlying trademark infringement claim. However, the court's determination that Plaintiffs did not actually use "Life is Beautiful" as a trademark only serves to underscore the court's conclusion that balance of equities weighs in favor of permitting Defendants to rely on an unclean hands defense. Moreover, this conclusion would be fatal to any

1   claim for trademark infringement of the "Life is Beautiful" mark, and provides an

2   alternative ground for resolving that issue.

3          Briefly, the Lanham Act defines a trademark as "any word, name, symbol, or

4   device, or any combination thereof . . . used by a person . . . to identify and distinguish

5   his or her goods . . . from those manufactured or sold by others and to indicate the source

6   of the goods, even if that source is unknown." 15 U.S.C. § 1127. Thus, the mark must be

7   used "in a way sufficiently public to identify or distinguish the marked goods in an

8   appropriate segment of the public mind as those of the adopter of the mark." *Brookfield*

9   *Commc'ns, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1052 (9th Cir. 1999). Defendants

10  contend that the "Life is Beautiful" mark does not serve to identify Plaintiffs' products in

11  the marketplace. Rather, it is an ornamental element of Plaintiffs' art and just one of

12  several positive phrases used in his artwork. (LIB Mot. Summ. J. 14-15.) Defendants also

13  contend that the use of the phrase of the title of an art show or as a mark on the back of

14  canvasses does not qualify the phrase as a mark. Rather, if Plaintiffs have a valid

15  trademark, it is to the name "Mr. Brainwash," which serves as Guetta's identifying brand

16  name in the art world. (*Id.*) Rather than rebut this evidence, Plaintiffs respond by stating

17  that Plaintiffs' registration of the mark on the Principal Register "constitutes prima facie

18  evidence of the validity of the registered mark and of [Plaintiffs'] exclusive right to use

19  the mark on the good and services specified in the registration." (Pls.' Opp'n LIB Mot.

20  Summ. J. 15-16.) However, where one party has presented evidence rebutting a claim to a

21  trademark, the registration is "merely evidence 'of registration,' nothing more." *Tie Tech,*

22  *Inc. v. Kinedyne Corp.*, 296 F.3d 778, 783 (9th Cir. 2002) ("Once the presumption of validity

23  is overcome, however, the mark's registration is merely evidence 'of registration,'

24  nothing more. This approach can be characterized as rebutting the prima facie case or

25  'piercing the presumption.'"). Given Defendants evidence that Plaintiffs' mark is not

26  actually a source identifier and that the majority of the marks at issue were fraudulently

27  obtained, Plaintiffs cannot solely rely on the presumption of validity without presenting

28  any other evidence substantiating their claim to a valid and protectable mark.

1   Accordingly, the court GRANTS summary judgment to Defendants on all causes of

2   action based on claims for trademark infringement as to the "Life is Beautiful" mark.

3   **B.   Counterclaim for Cancellation**

4   Although Plaintiffs have surrendered the eight "Life is Beautiful" trademark

5   registrations filed with false statements of use, Defendants continue to seek summary

6   judgment on their counterclaim for cancellation of the marks. (Defs.' Mot. Summ. J.

7   Cancellation.) According to Defendants, without an entry of judgment, Plaintiffs could

8   refile applications for the registrations at issue with new statements of use and then

9   reassert the same infringement claims against Defendants. (*Id.* 3-4.) Given that the court

10  has already concluded that Plaintiffs obtained the "Life is Beautiful" marks fraudulently,

11  Defendants would ordinarily be entitled to summary judgment on their cancellation

12  counterclaim. Having surrendered their marks, however, Plaintiffs argue that summary

13  judgment is now inappropriate because the issue is moot. (Pls.' Opp'n Mot. Summ. J.

14  Cancellation 5-6.)

15  If this cancellation action were proceeding before the Trademark Trial and Appeal

16  Board (TTAB), the ordinary rule would require that a party attempting to surrender their

17  mark rather than face judgment must obtain "the written consent of every adverse party

18  to the proceeding." 37 C.F.R. § 2.134(a). If a party failed to obtain this written consent,

19  judgment would be entered against it. *Id.* Discussing the analogous rule for marks subject

20  to an opposition, concurrent use, or interference proceeding, the TTAB has explained that

21  "the purpose of [the rule] is to preclude an applicant from attempting to moot the

22  opposer's pleaded claim (and thereby avoid entry of judgment thereon) by unilaterally

23  abandoning the application after commencement of the opposition proceeding. Opposer

24  is entitled to a decision on the merits of its pleaded claim." *Sharp Kabushiki Kaisha a/t/a*

25  *Sharp Corp.*, 2004 WL 725453, at *2 (TTAB Mar. 30, 2004).

26  Although this Court is not bound by the procedural rules as the TTAB, the logic

27  underlying such a rule is applicable in a proceeding before a federal court. Without an

28  entry of judgment, there is nothing to stop Plaintiffs from refilling their marks after the

conclusion of this litigation, and once again fraudulently deter potential competitors from entering the marketplace or subject Defendants to renewed trademark infringement actions. In fact, Plaintiffs own opposition to the cancellation motion acknowledges that a finding of fraud would provide a basis for entering judgment so as to prevent future fraud. (*See* Pls.' Opp'n Mot. Summ. J. Cancellation 5-6. ("Only if Defendants' had actually shown that AA committed fraud in procuring the Registrations would Defendants have had any basis to speculate that AA might commit the same fraud in the future.")

As to the mootness issue, Plaintiffs are correct that "an 'actual controversy' must exist not only 'at the time the complaint is filed,' but through 'all stages' of the litigation." *Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 726 (2013) (quoting *Alvarez v. Smith*, 558 U.S. 87, 92 (2009). A case becomes moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Murphy v. Hunt*, 455 U.S. 478, 481 (1982) (per curiam). At the same time, "a defendant cannot automatically moot a case simply by ending its unlawful conduct once sued." *Already*, 133 S. Ct. at 727. (citing *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)). Under these circumstances "a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 190 (2000).

While Plaintiffs contend that there is no risk of future fraudulent conduct, they have submitted no specific evidence to meet their "formidable burden." Were the positions of the parties reversed, and it was Defendants who claimed that they would cease infringing, Ninth Circuit law expressly holds that their voluntary cessation would not moot the infringement action. *Polo Fashions, Inc. v. Dick Bruhn, Inc.*, 793 F.2d 1132, 1135–36 (9th Cir. 1986). This is, in part, because "[i]f the defendants sincerely intend not to infringe, the injunction harms them little; if they do, it gives Polo substantial protection of its trademark." *Id.* So too here. If Plaintiffs have no intention of fraudulent refiling for trademark registration, judgment harms them little while giving Defendants substantial

1   assurance that they can proceed to build their business. Thus, in light of the court's

2   determination that Plaintiffs fraudulently obtained the first eight "Life is Beautiful"

3   trademarks, the court also GRANTS Defendants' counterclaim for cancellation of those

4   marks.

5       **C.   "Heart Design" Infringement Claims**

6       Defendants move for summary judgment on Plaintiffs' trademark infringement

7   and copyright infringement causes of action as to Plaintiffs' claimed trademark and

8   copyright in an image of a "splashed painted heart." As noted above, Plaintiffs assert

9   that, as early as 2009, Guetta used various heart designs in connection with his art work

10  and goods that he sold. (FAC ¶ 21.) Furthermore, Plaintiffs have registered a copyright in

11  at least one version of the heart design used by Guetta. For the first two years of the Life

12  is Beautiful festival, Defendants used a painted heart design as the logo of the festival.

13  (Boyd Decl., Ex. 58.) Defendants assert that they have since ceased using the logo but

14  Plaintiffs content that image can still be seen in connection with the festival on social

15  media. (*Compare id. with* Boudreaux Decl. 46.) For reference, the images are depicted

16  below:

17

18

19

20

21

22

23  (Def. LIB Mot. Summ. J. 33.) The image on the left was the logo of the Life is Beautiful

24  Festival. It features a heart composed of paint that looks like it was dripped onto a

25  canvas. The left side of the heart features to shades of red, while the right side features to

26  shades of purpose. The image on the right is one of the splashed heart designs produced

27  by Guetta. It appears to be composed of paint that looks like it was splashed onto a

28

16

canvas. This particular heart features one primary color, a slightly faded red, with some darker areas where more paint was used.

### 1. Trademark Infringement of Heart Design

Defendants contend that Plaintiffs trademark infringement claim as to the painted heart design fails because Plaintiffs do not use the image as a mark or a source identifier for either Plaintiffs' business or Guetta's artwork. (Def. LIB Mot. Summ. J. 30-31.) While Defendants acknowledge that Guetta has used the image in some of his works and on some merchandise sold by Plaintiffs, Defendants contend that the use does not rise to the level of a source identifier. (*Id.*) Furthermore, Defendants note that Plaintiffs' 30(b)(6) representative, Debora Guetta, did not consider the image a trademark but instead a copyright. In support, Defendants present deposition testimony from Plaintiffs' corporate representative where she stated:

> Q: Okay. Let's talk about the second topic. Amusement Art and It's A Wonderful World's use of heart images. Does Amusement Art make any use of heart images?
>
> A: Amusement Art, no.
>
> Q: How does It's A Wonderful World make use of heart images?
>
> A: In artwork, murals, some merchandise, on postcards, I guess.
>
> Q: And does – is it the company's position that it uses the heart as a trademark in all these different ways?
>
> MS. CALKINS: Objection. Vague and ambiguous.
>
> THE WITNESS: It's a copyrighted image.
>
> BY MS. GODLEY:
> Q: And not a trademark?
>
> A: It's not a trademark image, no.

(Debora Guetta Dep. at 160:15-161:6). In Defendants' view, this constitutes a binding judicial admission that Plaintiffs are not asserting a trademark over the heart design.

Plaintiffs respond that there is a triable issue of fact as to whether they use the heart design as a trademark. In support, Plaintiffs note an incident when Choudhry was asked during a meeting about using Guetta's mark and Choudhry responded by laughing and stating he was "inspired by Thierry's work." (Boudreaux Decl., Ex. 7 (Justin

17

Murphy Dep.) 104:15-105:4, 106:4-12.) Plaintiffs also note that one of their own employees testified that the image was a mark and one of Defendants' employees admitted the image was a "logo" for Guetta. (Boudreaux Decl., Ex. 14 (Roman Lefebvre Dep. 47:25-48:11, 52:8-9, 52:25-53:9; Boudreaux Decl., Ex. 8 (Josh Ripple Dep.) 61:7-22.) Finally, Plaintiffs contest Defendant's interpretation of the meaning and legal effect of the 30(b)(6) witness's statement regarding the use of the heart image as a trademark. On this point, Plaintiffs note that Debora Guetta's statement should only be read as an acknowledgement that Plaintiffs did not seek to register the heart image as a trademark rather than a concession that the image was not actually a mark. (Opp'n 23 (citing Debora Guetta Decl. ¶ 11 ("My testimony was that IAWW had not registered a heart design as a trademark with the PTO. I was not stating, as Ms. Godley is now asserting, that the 'Pop Heart' at issue in this lawsuit is not a trademark of AA or Thierry Guetta.")).) Plaintiffs also contend that, even if the statement could be construed as an admission the image was not a trademark, it is unsettled in the Ninth Circuit whether the statement of a 30(b)(6) witness is binding on a corporation as a judicial admission. (Opp'n 23 (citing *Coalition for a Sustainable Delta v. John McCamman*, 725 F. Supp. 2d 1162, 1172 (E.D. Cal. 2010)).)

As the parties recognize, the law in the Ninth Circuit is unsettled whether a corporate representative's deposition testimony constitutes a binding judicial admission, which the corporation cannot later controvert. Typically, a judicial admission is made in pleadings or stipulations by a party or its counsel. As one treatise describes it, judicial admissions are "not evidence at all but rather have the effect of withdrawing a fact from contention." Michael H. Graham, *Federal Practice and Procedure: Evidence* § 6726. Courts that have found a 30(b)(6) witness's statements binding as a judicial admission have grounded this rule in the rationale that a 30(b)(6) witness has a unique responsibility to participate in a deposition ready to offer accurate and binding testimony on behalf of the entity they represent. *See Coalition for a Sustainable Delta*, 725 F. Supp. 2d at 1172 n.10 (collecting cases). But other courts have concluded that "testimony given at a Rule

30(b)(6) deposition is evidence which, like any other deposition testimony, can be contradicted and used for impeachment purposes," and that such testimony does not "bind" the designating entity "in the sense of [a] judicial admission." *A.I. Credit Corp. v. Legion Ins. Co.*, 265 F.3d 630, 637 (7th Cir. 2001); *see Coalition for a Sustainable Delta*, 725 F. Supp. 2d at 1172 n.11 (collecting cases).

A 30(b)(6) witness should be afforded no greater or less relief than that which would be afforded to an individual party. The statements made by a 30(b)(6) witness during deposition, depending on the circumstances, can constitute relevant and probative evidence concerning the issue at hand. Of course, this does not mean that a party can withdraw their representative's prior testimony with impunity. As with any other litigant, the 30(b)(6) witness faces the same uphill battle of explaining to a trier of fact any retraction or qualification of a prior admission. *See, e.g., State Farm Mut. Auto. Ins. Co. v. New Horizont*, 250 F.R.D. 203, 212-13 (E.D. Pa. 2008) ("[W]here the nonmovant in a motion for summary judgment submits an affidavit which directly contradicts an earlier Rule 30(b)(6) deposition and the movant relied upon and based its motion on the prior deposition, courts have disregarded the later affidavit.") (quotations and alterations omitted) (collecting cases).

Under this standard, the court finds that Plaintiffs' 30(b)(6) representative's testimony constitutes an acknowledgement that the heart design did not function as Plaintiffs' trademark. As the transcript reflects, the witness was asked about where Plaintiffs used the heart image. (Debora Guetta Dep. at 160:15-161:6). After responding "artwork, murals, some merchandise, [and] on postcards," the follow-up question was whether it was the company's position that the image was *used* as a trademark in all of those respects. (*Id.* (emphasis added).) The witness's response was that the image was a "copyright image" and not a "trademark image." Plaintiffs' now attempt to controvert that testimony by arguing the response was actually about formal registration rather than actual use. This position is unsupported by the record. There is no suggestion in either the question or the surrounding transcript that anyone was discussing formal registration

1   as opposed to actual use as a mark. Accordingly, Plaintiffs' cannot rely on their 30(b)(6)

2   witness's ex post declaration to create a triable issue of fact.

3        Even if this court were to credit Plaintiffs' explanation of their witness's statement,

4   there is still no basis for concluding that there is a genuine issue of fact as to Plaintiffs'

5   trademark infringement claim. As noted above, the Lanham Act defines a trademark as

6   "any word, name, symbol, or device, or any combination thereof . . . used by a person . . .

7   to identify and distinguish his or her goods . . . from those manufactured or sold by

8   others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C.

9   § 1127. If a particular image is not "used to identify a manufacturer or sponsor of a good

10  or the provider of a service," then it cannot qualify for trademark protection. *See Mattel*

11  *Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 806 n.12 (9th Cir. 2003). Unregistered

12  trademarks, such as the claim to the heart design, are only protected if they have

13  acquired "secondary meaning." *See Toho Co. v. Sears, Roebuck & Co.*, 645 F.2d 788, 790 (9th

14  Cir. 1981). Here, Plaintiffs limited use of the heart design does not rise to the level of a

15  protectable trademark. There is only sporadic use of the mark in Guetta's artwork.

16  Moreover, even if Plaintiffs' corporate representative's statement does not constitute a

17  concession that the image is not used as trademark, it nonetheless provides compelling

18  admissible evidence suggesting that conclusion. Given this evidence, the court cannot

19  conclude that the references to a single statement by one of Plaintiff's employees that the

20  image is a mark and the statement by one of Defendant's employees that the image is a

21  logo create a triable issue of fact. Thus, the court GRANTS Defendants summary

22  judgment on Plaintiffs' claim for trademark infringement as to the heart design.

            2.   Copyright Infringement of Heart Design

23

24       In order to establish a claim for copyright infringement, a plaintiff must prove "(1)

25  ownership of a valid copyright, and (2) copying of constituent elements of the work that

26  are original." *Feist Pubs., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361. Defendants do not

27  contest that Plaintiffs own a valid copyright to the splashed painted heart image. Thus,

28  the question before the court is if there is a triable issue of fact whether Defendants

"cop[ied] anything that was 'original' to" Plaintiff's work. *Id.* Plaintiffs have not submitted any evidence of direct copying by Defendants. To the contrary, Defendants argue that they hired a designer who independently arrived at Defendants' version of the painted heart design. (Def. LIB Mot. Summ. J. 31-32.) "Absent evidence of direct copying, proof of infringement involves fact-based showings that the defendant had access to the plaintiff's work and that the two works are substantially similar." *Funky Films, Inc. v. Time Warner Entm't Co., L.P.*, 462 F.3d 1072, 1076 (9th Cir. 2006).

To show access, a plaintiff must show that there is a "reasonable possibility" that the defendant viewed the protected work. *L.A. Printex Indus.*, 676 F.3d at 846. Defendants argue that Plaintiffs have not submitted any evidence that Defendants' designer had any access to the image at issue nor any evidence that the work was "widely disseminated" enough to give rise to the inference of access. Plaintiffs respond that not only is Guetta's heart image broadly distributed, there is evidence that various works by Guetta were included in a presentation document provided to the designer. From these documents, Plaintiffs argue that there is a high likelihood that the designer had access to the heart image. Because this case can be resolved on the substantial similarity prong, the court will assume without deciding that Defendants had access to the heart design.

"When the issue is whether two works are substantially similar, summary judgment is appropriate if no reasonable juror could find substantial similarity of ideas and expression." *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994). Although "summary judgment is not highly favored on the substantial similarity issue in copyright cases," *Berkic v. Crichton*, 761 F.2d 1289, 1292 (9th Cir. 1985), substantial similarity "may often be decided as a matter of law." *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1164 (9th Cir. 1977). "Where the image at issue is ubiquitous, the copying must be exact." *See Satava v. Lowry*, 323 F.3d 805, 812 (9th Cir. 2003) (copyright infringement of ubiquitous symbols requires "virtually identical" copying); *Ets-Hokin v. Skyy Spirits, Inc.*, 323 F.3d 763, 766 (9th Cir. 2003) (same); Apple Computer, Inc. v. Microsoft Corp., 35 F.3d 1435, 1442 (9th Cir. 1994) (same).

Defendants contend that the heart image is the sort of ubiquitous image subject to the heighted "virtually identical" standard. (LIB Mot. Summ. J. 24) Thus, even though Guetta is entitled to protect his specific depiction of a heart, there is insufficient evidence to support the conclusion that LIB's heart design and Guetta's heart design are "virtually identical." (*Id*.) Plaintiffs do not challenge Defendants' contention that a copyright claim based on this heart image is subject to the "virtually identical" standard in light of the ubiquity of the image. Instead, Plaintiffs respond by submitting testimony from an LIB employee the purports to show that the employee could not distinguish LIB's heart design from Guetta's heart design. The excerpt provided states:

A. "—whatever – I don't know if it was his or ours or whatever --

Q. Okay.

A. -- but it's a similar looking type of logo.

(Ripple Depo. 62:24-63:3.) Plaintiffs further contend that, even if there are some differences between the heart images, the fact that both parties used similar heart images along with the phrase "Life is Beautiful" supports a finding of substantial similarity.

The court concludes that there is no triable issue of fact as to Plaintiffs' claim for copyright infringement of the heart design. First, a number of differences between the images leads to the conclusion that no rational jury could find the two heart designs "virtually identical." On the level of color, Guetta's heart is largely a monochromatic faded red while LIB uses at least two shades of two colors—red and purple—to depict their heart. Guetta's heart is composed of a much more dramatic splash of plaint with splatters reaching across the canvas, compared to LIB's more controlled drip pattern on the heart. Moreover, Guetta's heart looks like a handmade image with no smooth portions in the heart outline, while LIB's looks like it may have been computer-generated with extended smooth lines for several portions of the heart's outline. Finally, the fact that both heart designs were used in connection with the phrase "Life is Beautiful" does not support a finding of substantial similarity. As a matter of law, the court is unaware of any precedent that permits this additive approach, which allows a fact finder to consider

22

the images that a copyrighted image appears near in order to determine whether the images actually in dispute are themselves substantially similar. Moreover, as a factual matter, Defendants direct the court to a logo from an uninvolved third party that also uses the phrase "Life is Beautiful" with a splattered heart design, suggesting that such coincidences can occur without any further meaning. *See Life is Beautiful Platform*, www.lifeisbeatiful.org (last accessed Nov. 20, 2016).

Plaintiffs' efforts to rely on the deposition testimony of Josh Ripple is also inapposite. When read in context, it is evident that Ripple is not admitting that he cannot tell the designs apart. (*See* Ripple Depo. 61:7-25.) Instead, he was describing an incident where Guetta's representatives were showing Choudhry images during a dinner meeting. When asked by counsel during the deposition whether Ripple recalled the specific images shown, Ripple responded that he does not know whether "it was his our ours." (*Id.*) This stray remark of limited probative value is inadequate to create a triable issue of fact as to substantial similarity. Accordingly, the court grants Defendants summary judgment on Plaintiffs' claims for copyright infringement as to the heart design.

### D. Claims Against DLVM and Monetary Damages Claims

Having granted Defendants summary judgment on all of Plaintiffs' claims, it is unnecessary to resolve Defendant Downtown Las Vegas Management's separate motion for summary judgment on the grounds that DLVM cannot be held liable, as the managing company of the Life is Beautiful festival, under vicarious or contributory theories of infringement. (Dkt. 95.) Likewise, there is also no need to resolve Defendants' Motion for Partial Summary Judgment on the issue of monetary damages, given the absence of any liability in this case, or the Motion to Exclude Expert Testimony of Jonny Joseph. (Dkts. 137, 138.) Accordingly, the court VACATES those motions.

### IV. CONCLUSION

For the reasons stated above, the court GRANTS Defendants' Motion for Summary Judgment on all of Plaintiffs' Claims. Further, the Court GRANTS Defendants'

Motion for Summary Judgment on Defendants' Counterclaims for Cancellation. The Court DISMISSES the case and VACATES all other pending motions.

**IT IS SO ORDERED.**

Dated: November 29, 2016

_____

DEAN D. PREGERSON
UNITED STATES DISTRICT JUDGE